PER CURIAM *.
hWe granted the state’s application to consider the judgment of the district court vacating respondent’s sentence of death. For the reasons that follow, we reverse the district court and reinstate respondent’s capital sentence.
Respondent was convicted of first degree murder and sentenced to death in 1995 for the killing of his wife, Tracie Williams, in what the state urged jurors to find was. a murder-for-hire scheme motivated by respondent’s desire to collect the nearly $1,000,000 in life insurance on the victim. This Court affirmed respondent’s conviction and sentence on direct appeal. State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922.[1] Respondent thereafter initiated post-conviction ^proceedings in the district court. The proceedings extended over years of litigation and evidentiary hearings on a variety of claims, including allegations that prosecutorial misconduct involving former assistant district attorney Ronald Bodenheimer, ranging from suppression of exculpatory evidence and subornation of perjury to a conflict of interest arising from Bodenheimer’s simultaneous representation of the victim’s family in civil proceedings to recover insurance on Tracie Williams’s life, even as he conducted the prosecution against relator, required reversal of respondent’s conviction and sentence.
This litigation took place against the background of Bodenheimer’s subsequent unrelated legal difficulties which received considerable notoriety and resulted in the surrender of his law license and his imprisonment on federal charges of mail fraud and conspiracy shortly after he left the bench in the 24th Judicial District Court, to which he had been elected after respondent’s trial. See In Re White, 08-1390, p. 8, n.4 (La.12/2/08), 996 So.2d 266, 268; In Re Bodenheimer, 03-1383 (La.6/18/03), 848 So.2d 540.
The ad hoc judge appointed to hear the petitioner’s claims ultimately denied respondent post-conviction relief on his conviction for the first degree murder of Tracie Williams, thereby rejecting specific claims that Bodenheimer had suppressed material exculpatory evidence and suborned perjury, but vacated his sentence of *1032 death. Both relator and the state sought review of the district court’s ruling. We denied respondent’s application, State ex rel. Ortiz v. State, 02-0601 (La.9/12/12), 98 So.3d 808, and thereby left his conviction undisturbed. We granted the state’s application, however, to consider the district court’s ruling that Bodenheimer’s conflict of interest related to his subsequent civil representation of the victim’s family following respondent’s trial, although not sufficiently prejudicial to reverse relator’s conviction, raised substantial concerns about the reliability of the jury’s sentencing verdict and required setting aside the death penalty.
In its judgment, the district court found, and the parties do not dispute, that following the jury return of a death sentence on the night of October 12, 1994, Bodenheimer signed a contingency contract less than two weeks later, on October 21, 1994, to represent the Williams family in their efforts to recover on life insurance policies written by New York Life Insurance Company, totaling $900,000, for Tracie Williams. The policies listed respondent as the sole beneficiary. Bodenheimer’s representation came about as the result of a fortuitous meeting between his private law partner and members of the Williams family at a local restaurant after the family had decided to pursue the insurance claim. Members of the Williams family testified during the post-conviction proceedings and corroborated that sequence of events. Although no evidence indicated that any discussion of the civil action related to the insurance proceeds took place either before or during the guilt and sentencing stages of trial, Bodenheimer testified in the post-conviction proceedings that he nevertheless had misgivings about representing the Williams family and so advised District Attorney John Mamoulides, who gave him the green light to proceed. Bo-denheimer signed the contract but he also continued to represent the state during the post-verdict stages of respondent’s case without alerting either respondent or the court to any possible conflict. Bodenheimer thus appeared for the state during the hearing on respondent’s motion for a new trial, in which he cross-examined witnesses, and testified with respect to what he did or did not know about any involvement of | /Tracie Williams’s in the fraudulent insurance claim related to the supposed theft of her Isuzu vehicle the F.B.I. later found in El Salvador (see n.l, supra). The transcript of sentencing on January 31, 1995, also indicates that Bodenheimer represented the state at the proceedings, although he did not actively participate in the wrangling between the trial court and defense counsel over the repeated filing of supplemental motions for a new trial before sentence was imposed.
Given that evidence, the district court found that an actual conflict of interest had been created by Bodenheimer’s continued participation in the post-verdict stages of respondent’s criminal case after he signed the contract with the Williams family, and that the conflict was “integrally related to the civil litigation because the civil action could succeed only if Mr. Ortiz, who was listed as the primary beneficiary of the insurance policies, was convicted, and remained so.” The district court detailed a number of Bodenheimer’s transgressions in other instances as a reflection of his willingness “to breach his ethical duties, and violate the constitutional rights of the parties, in exchange for personal gain.” With respect to respondent’s case, the court specifically found that while Boden-heimer “had argued throughout the prosecution that Mr. Ortiz was responsible for increasing the insurance policies on his wife’s life,” an argument that “may well have influenced the jury to recommend the death penalty,” Bodenheimer “made the opposite argument in the civil cases; he argued that it was the victim, Tracie *1033 Williams, rather than Mr. Ortiz, who contracted with the insurance company to increase the polices on her life.”
For the court, these apparently conflicting positions offered “yet another example of Mr. Bodenheimer’s willingness to act in an unprincipled manner for personal gain.” The court found it especially “[r]epugnant that a prosecutor would, in a death penalty case, urge the jury to make a particular | .^factfinding, and then, in a related civil case, argue for the opposite conclusion, one which may have aided the defense in the criminal case.” Given the heightened need for reliability in the capital sentencing determination, see, e.g., Caldwell v. Mississippi, 472 U.S. 320, 323, 105 S.Ct. 2633, 2636-37, 86 L.Ed.2d 231 (1985) (noting the “heightened ‘need for reliability in the determination that death is the appropriate punishment in a specific case’ ”) (quoting Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976)), the court concluded that Boden-heimer’s “conduct in the related civil cases has cast a shadow on the criminal prosecution, rendering the death sentence [if not the conviction] unreliable.” Cf. State ex rel. Busby v. Butler, 538 So.2d 164, 172 (La.1988) (claim of ineffective assistance of counsel did not require setting aside defendant’s conviction for first degree murder but justified granting post-conviction relief from his sentence of death because counsel’s failure to develop and present mitigating evidence of mental impairment “undermine[d] confidence in the outcome of this phase of trial”); State v. Lee, 524 So.2d 1176, 1192 (La.1987) (on rehn’g) (error in admitting defendant’s confession harmless with respect to his conviction for first degree murder but required reversal of the death penalty because of a “reasonable possibility that the confession might have contributed to at least one juror’s decision to impose the death penalty”).
The district court’s judgment reflects the view to which this Court has long subscribed that a district attorney is a “quasi judicial officer” and, as such, “should not be involved or interested in any extrinsic matters which might, consciously or unconsciously, impair or destroy his power to conduct the accused’s trial fairly and impartially.” State v. Tate, 185 La. 1006, 171 So. 108, 112 (1936) (trial court erred in denying defendant’s motion to recuse District Attorney from prosecution for blowing up a cotton gin on grounds the District Attorney represented insurers attempting to recover from defendant the loss on property | f,destroyed in the explosion); cf. La.C.Cr.P. art. 680(1) (District Attorney shall be recused when he “[h]as a personal interest in the cause or grand jury proceeding which is in conflict with fair and impartial administration of justice.”). Although prosecutors “need not be entirely neutral and detached” and “are necessarily permitted to be zealous in their enforcement of the law,” they are “also public officials” who “must serve the public interest.” Marshall v. Jerrico, Inc., 446 U.S. 238, 248-49, 100 S.Ct. 1610, 1616, 64 L.Ed.2d 182 (1980). The prosecutor’s duty in this respect does not end with the jury’s return of a verdict but continues through the post-verdict stages of the prosecution. Imbler v. Pachtman, 424 U.S. 409, 427, n. 25, 96 S.Ct. 984, 993, 47 L.Ed.2d 128 (1976) (“At trial this duty [of the prosecutor to bring to the attention of the court or of proper officials all significant evidence suggestive of innocence or mitigation] is enforced by the requirements of due process, but after a conviction the prosecutor also is bound by the ethics of his office to inform the appropriate authority of after-acquired or other information that casts doubt upon the correctness of the conviction.”).
Thus, even in the post-verdict stages of a criminal prosecution, “[a] *1034 scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions.” Marshall, 446 U.S. at 250-51, 100 S.Ct. at 1617 (citation omitted). But violations of the public trust and of ethical codes by an assistant district attorney, while they may afford a basis for professional sanctions, see, e.g., In Re Toups, 00-0634 (La.11/28/00), 773 So.2d 709, do not alone justify setting aside a final conviction or sentence, even in a capital case, because the requirements of due process and canons of professional ethics or standards are not co-extensive. See, e.g., Kyles v. Whitley, 514 U.S. 419, 437, 115 S.Ct. 1555, 1567, 131 L.Ed.2d 490 (1995) (“[T]he Constitution is not |7vioIated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense.... [It] requires less of the prosecution than the ABA Standards for Criminal Justice, which call generally for prosecutorial disclosures of any evidence tending to exculpate or mitigate.”) (citing ABA Standards for Criminal Justice, Prosecution Function and Defense Function 3 — 3.11(a) (3d ed.1993)). Grounds for post-conviction relief in Louisiana are primarily restricted to constitutional or jurisdictional violations, La.C.Cr.P. art. 930.3, and “the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor ... the aim of due process ‘is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused.’ ” Smith v. Phillips, 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982) (quoting Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963)).
Respondent must therefore show not only that a conflict of interest existed but also that it prejudiced him by rendering the sentencing phase of his trial fundamentally unfair and the result unreliable. See, e.g., Gallego v. McDaniel, 124 F.3d 1065, 1079 (9th Cir.1997) (no due process violation occurred when prosecutor entered into a book deal after defendant was convicted and sentenced to death, when defendant failed to show that prosecutor’s pecuniary interest arose before the conclusion of trial or that it prejudiced the defense in any way) (reversing on other grounds); see also Commonwealth v. Balenger, 772 A.2d 86, 93 (Pa.Super.2001) (“Undoubtedly some prosecutors are aware that a conviction in a certain case might advance their careers. Can the fact that a prosecutor is motivated by the potential benefits of prosecuting a particular case be used as a basis to nullify an ensuing conviction? In our opinion, as long as the motivational factor does not lead the prosecutor to ‘step over the line’ and engage in improper | ^conduct, we think the answer to the above rhetorical questions must be ‘no.’ ”); compare Ganger v. Peyton, 379 F.2d 709, 714 (4th Cir.1967) (defendant denied due process when District Attorney representing defendant’s wife in divorce proceedings based on an assault committed by defendant attempted to use the criminal proceedings as leverage for a favorable property settlement in the civil case).
In the present case, the district court found prejudice in Bodenheimer’s apparent flip flopping on the question of Tracie Williams’s insurance coverage and serious constitutional questions may arise when a prosecutor, for whatever reason, adopts inconsistent positions with respect to the factual bases urged for the return of a death sentence in a capital case. See Bradshaw v. Stumpf, 545 U.S. 175, 187, 125 S.Ct. 2398, 2407-08, 162 L.Ed.2d 143 (2005) (reversing Sixth Circuit decision vacating petitioner’s guilty plea but remanding for consideration of whether “[t]he *1035 prosecutor’s use of allegedly inconsistent theories [as to which of two co-defendants actually shot and killed the victim] may have a more direct effect on Stumpfs [death] sentence ... for it is at least arguable that the sentencing panel’s conclusion about Stumpfs principal role in the offense [as the shooter] was material to its sentencing determination.... [I]t would be premature for this Court to resolve the merits of Stumpfs sentencing claim, and we therefore express no opinion on whether the prosecutor’s actions amounted to a due process violation, or whether any such violation would have been prejudicial.”);[2] Jacobs v. Scott, 513 U.S. 1067, 115 S.Ct. 711, 130 L.Ed.2d 618 (1995) (Stevens, J., dissenting from denial of certiorari) (“[F]or a sovereign State represented by the same lawyer to |fltake flatly inconsistent positions in two different cases — and to insist on the imposition of the death penalty after repudiating the factual basis for that sentence — surely raises a serious question of prosecutorial misconduct.... The ‘heightened need for reliability’ in capital cases ... only underscores the gravity of those questions in the circumstance of the case.”) (quoting Caldwell, 472 U.S. at 323, 105 S.Ct. at 2636); cf. Thompson v. Calderon, 120 F.3d 1045, 1058 (9th Cir.1997) (“[W]hen no new significant evidence comes to light a prosecutor cannot, in order to convict two defendants at separate trials, offer inconsistent theories and facts regarding the same crime.”); State v. Holmes, 06-2988, p. 24 (La.12/2/08), 5 So.3d 42, 62 (“Due process forbids a state from employing inconsistent and irreconcilable theories to secure convictions against individuals for the same offenses arising from the same event.”) (discussing Stumpf).
We conclude, however, that in the present case respondent has failed to show that the sentencing phase of his trial was rendered fundamentally unfair because Bo-denheimer espoused a theory of respondent’s moral culpability he later discarded in the civil proceedings as inconsistent with the factual circumstances surrounding the rapidly increasing insurance coverage on Tracie Williams. The position taken by Bodenheimer in the civil proceedings did not reveal an aspect of the insurance coverage that may have led one or more jurors to assess respondent’s moral culpability differently if they had heard the evidence because jurors already had the information available to them in the testimony of the insurance agent Mario Ramirez, who wrote the policies for New York Life Insurance Company.
The state called Ramirez in support of its theory that respondent killed his wife to collect on her life insurance and return to El Salvador to live the good life and that he was responsible for the rapid escalation of the policy limits. Bodenheimer opened the state’s case in chief at the guilt stage by informing jurors 1 inthey would hear evidence that “Manuel started buying insurance; life insurance on Tracie. He bought a lot of life insurance on Tracie.” Bodenheimer closed the guilt stage of trial by arguing that: “It was always Manuel Ortiz who called ... and said I want to change or increase the insurance.... He’s the one that had the interest to keep raising it and he’s the one that kept doing it....” At the close of the sentencing stage, Bodenheimer argued to jurors “the only way that you can only ever protect someone’s life is to send a message to Manuel Ortiz and people like him, don’t *1036 come into our country, don’t scam our insurance companies, don’t kill our women and try to leave again with your fortune.”
Jurors had the opportunity to evaluate those remarks on the basis of the testimony by Ramirez exactly how the policies came about. The insurance agent explained that respondent’s initial term life insurance policy, in his name only, was for $150,000, with an additional $150,000 accidental death benefit. Respondent listed as his beneficiary a woman whom he identified as his cousin but was in reality the mother of his illegitimate son born in El Salvador just two weeks after Tracie Williams died. Ortiz, 96-1609, p. 7, n. 6, 701 So.2d at 927. When he contacted Ramirez shortly thereafter with regard to raising the limits on his policy to $250,000 each, or a total of $500,000, and insuring Tracie Williams, whom he had just married, by adding her to his policy, the agent spoke with Tracie Williams and explained what the coverage entailed. Because respondent could not unilaterally add his wife to his own policy, she then filled out and submitted a separate application to add herself with the same $250,000 limits for a total of $500,000. Ramirez testified that he spoke with Tracie Williams four times about the policy and had no doubt that she had signed the application, although respondent had been the one to bring it to his office. The application was “exactly the same” as the one originally submitted by respondent and it entailed an Ininterview and some medical tests, “which she did.” The application also listed respondent as the beneficiary, something which respondent could not arrange on his own but had “to be with her consent.” At the same time, respondent also added Tracie Williams as a beneficiary on his part of the policy.
Respondent then contacted Ramirez and raised the limits for both of them to $850,000 for illness and $300,000 for accidental death, for a total of $650,000. According to Ramirez, Tracie Williams was fully aware of the increase because he discussed it with her over the telephone. Finally, when respondent bought a separate whole life policy for $100,000, with a $100,000 accidental death benefit, and a $50,000 dividend option term in his name only, for a total of $250,000, Tracie Williams informed Ramirez that she wanted a separate whole life policy of her own “equal to the same that Manuel[] was taking.” Williams then signed the papers in person in his office, although only the agent’s wife was present when she did so, thus raising the total amount of her life insurance to $900,000. Ramirez testified that he met Tracie Williams only once personally but spoke to her over the telephone 10 to 12 times in the course of writing her insurance. The agent described her as a “very smart person, very intelligent.”
According to the trial testimony of F.B.I. Agent Harry Rodriguez, Carlos Saavedra, working as an informant, told him that respondent bragged he “had an individual that worked for an insurance company that had access to records and computers; and through this individual, they could insure anyone, without this individual knowing that they had been insured for life insurance.” Further, Saavedra informed the agent that respondent claimed he had “solicited the source in order for this individual to be killed, and once this individual was killed, a designated individual as a beneficiary could receive the proceeds.” If Ramirez were believed, however, and jurors had no particular reason to disbelieve him |12while the defense condemned Saavedra as a remorseless liar, respondent’s boast was an idle one with respect to Tracie Williams because she knew about, and subscribed to, the full extent of her insurance coverage. In his closing argument at the guilt stage, de *1037 fense counsel underscored the point by observing: “Carlos Saavedra says the scheme that old Manuel’s got is to insure somebody without them knowing it and collect some money. Well up jumps the devil on that because Traeie goes down and gets [a] blood test, gets added to the policy. She knew about it.” Bodenheimer conceded the point in his rebuttal argument in which he made no effort to promote a theory respondent had insured his wife without her knowledge but focused instead on respondent’s frequent contacts with Ramirez which resulted in the rapid escalation of the coverage.
It therefore appears that the arguments made by Bodenheimer in the criminal and civil proceedings were not diametrically opposed but emphasized different aspects of the same evidentiary nexus established by Ramirez’s testimony. Respondent did not testify at the guilt stage but he took the stand during the sentencing phase, denied killing his wife, and explained the ballooning insurance coverage as the result of collusion between Ramirez, who stood to profit by writing the policies, and Traeie Williams. Respondent informed jurors that when he “came back every time from El Salvador .... she was telling me, look, I spoke to Mr. Ramirez and I think we got to do this.” Bodenheimer’s theory of the motive underlying Trade Williams’s murder anticipated this line of defense by emphasizing Ramirez’s testimony that respondent instigated and played an integral role in securing and increasing the insurance coverage on his new wife as part of the scheme to kill her for the proceeds. While Bodenheimer may have exaggerated that role to some extent, particularly with regard to the whole life policy secured by Traeie Williams in her own right, the trial court specifically instructed jurors that 1 isthe arguments of counsel were not evidence and that they alone would determine what the evidence did or did not prove. Ramirez’s testimony also provided Bode-heimer with a factual basis to argue in the subsequent civil proceedings, without contradicting his theory of the criminal prosecution, that the insurance policies were not an absolute fraud on New York Life because Traeie Williams, clearly not part of a scheme to kill her for the policy proceedings, in fact applied for both term and whole life coverage, with premiums paid out of the community she shared with respondent, and to which she contributed with her own income, in the belief she had a future with respondent to protect.
With no evidence that any prosecu-torial decision made before or during the guilt or sentencing stages of trial stemmed in whole or part from any pecuniary interest in the insurance proceeds relating to Traeie Williams’s death, including the decision to charge respondent with his wife’s murder, and with no evidence that the position taken by Bodenheimer in the civil proceedings to recover those proceeds for the Williams family so conflicted with the theory of prosecution in respondent’s criminal case that the latter appears to have injected an arbitrary factor into the sentencing stage by removing relevant facts from the jury’s consideration, the district court erred in vacating respondent’s death sentence. Accordingly, the judgment below is reversed and respondent’s death sentence is reinstated.
JUDGMENT OF THE DISTRICT COURT REVERSED; SENTENCE OF DEATH REINSTATED.
LANDRIEU, Justice ad hoc, dissents with written reasons.

 Retired Judge MOON LANDRIEU, assigned as ad hoc, sitting for Justice GREG G. GUIDRY, recused.

. On appeal, we summarized the evidence presented at trial as follows
The state relied primarily on the evidence of Ortiz’s purchase of the relatively rare knife used to stab Tracie, his participation in the purchase of unrecovered Glock pistols consistent with the type of weapon used to murder [Cheryl] Mallory, his designation as sole primary beneficiary on the life insurance policies on Tracie’s life (totaling $900,000), and the testimony of Carlos Saavedra that just a few months before the actual murders, Ortiz had proposed a murder-for-hire insurance scheme to him in which the description of the victim and the manner of commission of the crime bore striking similarities to the crime actually committed. The testimony of Saavedra was .... corroborated by evidence that Tracie’s Isuzu, which had been reported stolen, was taken to El Salvador by Ortiz and ended up in the hands of a business partner of Ortiz's brother, consistent with the auto-theft insurance fraud scheme Ortiz had also proposed to Saavedra. Ortiz, 96-1609 at 7-8, 701 So.2d at 928.
With respect to Cheryl Mallory, who was not a target of the insurance scheme but was caught in the wrong place at the wrong time and died of gunshot wounds inside the Ortiz condominium while Tracie Williams lay dying in an alleyway outside the residence, this Court vacated respondent's conviction for first degree murder and sentence to death for her killing, entered a judgment of guilty of second degree murder and remanded for re-sentencing. Ortiz, 96-1609 at 20, 701 So.2d at 934.

. On remand, the Sixth Circuit found that the inconsistent positions taken by the prosecutor rendered the sentencing phase of defendant's capital trial unreliable and vacated the death penalty. Stumpf v. Houk, 653 F.3d 426 (6th Cir.2011). The court of appeal granted rehearing en banc, however, thereby vacating the panel opinion. 2011 U.S.App. LEXIS 21892 (6th Cir. Oct. 26, 2011).