EDWIN A. LOMBARD, Judge.
liThe defendant; Michael Dabney, appeals his conviction for attempted murder *518 of a police officer and being a felon in possession of a firearm. After review of the record in light of the applicable law, we afiSrm the judgment of the trial court.

Relevant Procedural History

On December 27, 2013, the defendant was charged in a three count bill of information with the attempted first degree murders of New Orleans Police Department (NOPD) officers: Counts 1 and 2 charged the defendant with, respectively, the attempted murder of Sergeant Eric Gillard and Officer Troy Pichón, in violation of La. Rev. Stat. 14: (27)30. Based on the defendant’s prior conviction for second degree battery, the defendant was charged in Count 3 with being a felon in possession of a firearm in violation of La. Rev. Stat. 14:95.1.
On January 9, 2014, the defendant pleaded not guilty to all charges. The trial court denied the defendant’s motions to suppress the evidence, statement and identification on July 14, 2014. Two days later (on July 16, 2014), the jury returned guilty verdicts as to Counts 2 and 3 but, in light of the jury’s inability to reach as a verdict as to the final charge, the court declared a mistrial as to Count 1. | ^Subsequently, on July 28, 2014, the defendant pleaded guilty to Count 1, reserving the right to withdraw his plea if the convictions on Count 2 and 3 were set aside. That same day, the trial court sentenced the defendant to fifty years on each attempted first degree murder conviction and to twenty years for possession of a firearm by a convicted felon, all sentences to run concurrently.
On August 4, 2014, the trial court denied the defendant’s motions for new trial and post-verdict judgment of acquittal, but granted his motion for appeal. That same day, the defendant was adjudged a fourth felony offender, his previous sentence was vacated, and he was sentenced on each count to life imprisonment without benefit of parole, probation, and suspension of sentence pursuant to La. Rev. Stat. 15:529.1(A)(4)(b).
This timely appeal follows.

Relevant Facts

The following relevant facts were adduced- at trial. The defendant’s sister, April Dabney, claimed at trial that she had a three year romantic relationship with Officer Pichón and that she revealed the relationship to the defendant while he was incarcerated for second degree battery. Because Ms. Dabney was only nineteen at the beginning of the relationship and Officer Pichón was married, the defendant objected to the relationship. Upon his release, Officer Pichón harassed the defendant, stopping him on one occasion but releasing him when he revealed his relationship to Ms. Dabney. According to Ms. Dabney, her brother did not have a gun and the charges in this case arose from Officer Pichoris harassment of her brother.
| oQfficer Pichón, a member of the NOPD Task Force Unit, testified that in response to a rash of robberies, he and his partner (Sergeant Gillard) were patrolling in the Sixth District on the night of October 28, 2013. At the intersection of LaSalle and Fourth Streets, Officer Pichón observed the defendant, wearing a black hoodie and camouflage shorts, step off the curb into the street. His attention was drawn to the defendant’s black hoodie because earlier armed robbery reports indicated that the perpetrators were wearing hoodies to conceal their identity. As the police unit approached, the defendant turned to his left, looked directly at the officers with a startled expression and clutched an unseen, bulging object. in his waistband. Based upon this reaction, the officers elected to conduct a pedestrian stop. Accordingly, Sergeant Gillard stopped the unit and Offi *519 cer Pichón stepped out, calling to the defendant to approach for investigation purposes. Instead, the defendant grabbed his waistband with botlj hands and ran in the opposite direction. Officer Pichón radioed dispatch that he and Sergeant Gillard were in an emergency situation and requested backup, then Officer Pichón proceeded to chase the defendant on foot while Sergeant Gillard attempted to intercept him with the police car. As the police car pulled up to the defendant, he stopped and immediately shot at Sergeant Gillard. After the defendant ignored his order to drop the weapon, Officer Pichón shot at him. The defendant turned, faced Officer Pichón, and shot at him, wounding Officer Pichón in his right thigh. The defendant ran towards Officer Pichón, firing several more times. Officer Pichón continued to shoot at the defendant, however, causing the defendant to change direction and run across Third Street, fleeing the scene. Officer Pichón radioed the dispatcher, requesting medical assistance for his injury and describing the defendant and his flight route to be transmitted to police units in the area. Officer |4Pichon identified State’s Exhibit 5 as the transcript of his report to dispatch at the time of the incident.[1]
Officer Pichón testified that the video surveillance system from a nearby building captured footage of the incident, showing the police unit approaching Third Street, the defendant crossing the street, Officer Pichón exiting the unit and chasing the defendant, and the defendant turning and firing at Sergeant Gillard and Officer Pi-chon. Subsequently, the video displays the arrival of other police units’ on the scene.
Officer Pichón conceded that he had contact with members of the defendant’s family in the past because the defendant’s mother and sister, April Dabney, served as confidential informants and that information received from April resulted in the successful prosecution of violent offenders in the Sixth District. He denied, however, having a romantic/sexual relationship with April although he had been in contact with Ms. Dabney and the defendant’s mother since the shooting and when Ms. Dabney sent a text message inquiry about his injury. Officer Pichón identified the defendant in court as the man who shot him.
On cross-examination, Officer Pichón denied telling the defendant’s mother and sister that if he had recognized him the night of the shooting, he would not have stopped the defendant. However, after the defense counsel played a small portion of an audio tape [2] (reportedly made by Ms. Dabney during the meeting he had with defendant’s family members) Officer Pi-chon identified his voice on the audio and acknowledged that it was a recording of him telling the defendant’s 1 ¿mother[3] that, if he had known the defendant was her son, he would not have been “fooling with the dude.” He explained that, in making the statement, he was attempting to placate the defendant’s mother and minimize the damage because some of the defendant’s family members were confidential informants.
At this juncture, the State objected that it had not yet heard the audio. The judge removed the jurors from the courtroom *520 and conducted a bench conference during which the entire recording was played for the State. The judge concluded that defense counsel would be allowed to impeach Officer Pichón with the recording. Under further cross-examination, Officer Pichón admitted telling the defendant’s mother and sister that there had been occasions where he stopped suspects with drugs and guns but let them go. Officer Pichón explained that he was speaking in private with the defendant’s mother and told them certain things “just trying to calm their nerves down about the situation because it was sensitive, [him] having a relationship with them and being involved in this situation with their son.” He denied ever allowing anyone in possession of drugs to leave after he had stopped them.
On redirect examination, the State played for the jury the twelve minute audio made by April Dabney.
Sergeant Gillard testified,- reiterating Officer Pichon’s testimony .as to the night of the shooting. Sergeant Gillard added that when they first approached the defendant, he looked at them and grabbed the front portion of his pants’ waistband which suggested to Sergeant Gillard that he was concealing a weapon in his waistband. When Sergeant Gillard stopped the police unit, Officer Pichón exited calling to the defendant that he would like to speak with him. With that, the [^defendant grabbed his waistband and began to run. Officer Pichón pursued the defendant on foot as Sergeant Gillard attempted to cut off the defendant’s flight with the police can Sergeant Gillard said he . clearly saw the defendant’s face from a distance of no more than ten to fifteen feet. When Sergeant Gillard pulled alongside of the defendant, the defendant fired upon him as he ducked down in the car. The defendant shot out one of the tires on the police unit and Sergeant Gillard got out of the car as the defendant continued to fire at him. When the defendant ran away, Sergeant Gillard ran -to the rear of the police unit and watched the defendant flee towards Fourth Street. Not seeing Officer Pichón, who he assumed was still chasing the defendant, Sergeant Gillard turned the police car around to back up Officer Pichón. When Sergeant Gillard reached the corner, however, he saw Officer Pichón down on the ground with a gunshot wound to his leg. While the shooting was in progress, Sergeant Gillard had relayed events to dispatch, requesting help. Accordingly, EMS arrived shortly thereafter and transported Officer Pichón to the hospital. Wflien Sergeant Joseph Catalanotto arrived on the scene, Sergeant Gillard related to him the facts of the incident and, after the defendant’s apprehension, identified him as the shooter.
Sergeant Regina Williams testified she was .assigned to investigate the attempted murders of Officer Troy Pichón and Sergeant Eric Gillard, which occurred at La-Salle and Third Streets on October 28, 2013, at approximately 9:19 p.m. When she arrived at the scene, it was cordoned off by yellow tape, but no suspect had yet been apprehended. According to Sergeant Williams, Officer Pichon’s blood, police gun, and uniform were on-the ground, along with multiple .40 caliber Smith and Wesson and .10 millimeter Hornady bullet casings. The .40 caliber casings were clustered around Officer Pichon’s uniform and the .10 caliber |7casings were spread out as if someone were running when the bullets were fired. Sergeant Williams determined that Officer Pichón used a department issued Glock 22.40 caliber handgun at the time of the shooting. . The Sixth District patrol car driven by Sergeant Gillard had a flat front tire caused by a bullet. Officer Pichón had already been transported to the hospital but Sergeant Williams received a full description of the evening’s *521 events from Sergeant Gillard who1 was still on the scene when she arrived. Sergeant Gillard, describing the perpetrator as a dark-skinned black male wearing a black hooded sweatshirt and camouflage shorts, stated that the perpetrator fired at him, shot Officer Pichón and then, fled the scene on foot.
Sergeaiit Williams testified that she called in the SWAT team and a K9 unit to search for the suspect. Approximately two hours after the shooting, the suspect was located' under the house at 2304 Third Street, one block away from where Officer Pichón was shot. When the suspect was apprehended, he was wearing only his underwear, a white tank top and black ankle socks. As soon as the defendant was apprehended, Sergeant Gillard identified him as the shooter. Sergeant Williams identified the defendant in court as the suspect apprehended the night of the shooting.
In addition, Sergeant Williams stated-that a wallet containing the defendant’s identification card and another wallet with no identification was found in the backyard of the house where the defendant was found hiding. Sergeant Williams also found a pair of camouflage shorts matching the description of the shorts reportedly worn by the suspect at the time of the shooting. The crime lab was ordered to perform a field gun powder residue test on the defendant’s hands and face immediately after" his apprehension and the test proved positive. Sergeant |8Williams also obtained a warrant to collect the defendant’s DNA for comparison with the camouflage shorts recovered that night. Sergeant Williams testified specifically that when ’she located the gun and hood-ie/sweatshirt, each item was placed in a separate, sterile bag and she had no’ direct contact with the evidence. Further, she testified that DNA could not have been transferred from the gun to the hood-ie/sweatshirt or vice versa because the items never came in contact with one another while in police custody.
Sergeant Williams also obtained the surveillance video that captured the initial contact between Officer Pichón, Sergeant Gillard, and the defendant. Sergeant Williams opined that, contrary to the defendant’s contention, the surveillance video indicated that it was virtually impossible for Sergeant Gillard to have shot Officer Pichón. Sergeant Williams conceded that she was unable to locate any civilian eyewitnesses to the shooting, although she had spoken to several people who heard the shooting.
The morning after the shooting, Sergeant Williams returned to the scene to search for the suspect’s black hooded sweatshirt and' the weapon used to shoot Officer Pichón. With the aid of an ATF agent and the agent’s firearm detection K9, Sergeant Williams located the defendant’s gun — a .10 millimeter Glock Model 29 — wedged between an iron fence and brick wall in the rear of the residence at 2680 LaSalle Street. Sergeant Williams continued to retrace the suspect’s escape route and,’ along with Sergeant LeBlanc found the black sweatshirt in the rear yard of 2325 Fourth Street. Sergeant Williams confirmed that the camouflage shorts, firearm and sweatshirt were all found within the same block as the house where the defendant was found hiding.
| ¡After the defendant’s arrest, Sergeant Williams determined that the defendant was a convicted felon and, therefore, his possession of a weapon was illegal which resulted in his being booked as a felon in possession of a firearm. Sergeant Joseph Catalanotto, who assisted in the investigar tion of the shooting, testified that he arrived on the scene after Officer Pichón had been transported to the hospital, but that Sergeant’ Gillard recounted what hap *522 pened, describing the perpetrator as a black male with a dark complexion, 5'8" to 6' tall, wearing a black hoodie with a pair of camouflage cargo pants and firing a semi-automatic handgun. Sergeant Cata-lanotto learned while he was still at the scene that a suspect had been apprehended under the house located at 2304 Third Street and, as he recalled, the suspect was clothed only in his underwear when he was apprehended. Sergeant Ca-talanotto identified the defendant in court as the suspect found under the house on Third Street and further stated that, when the defendant was apprehended, Sergeant Gillard had identified him as the man who shot at him and Officer Pichón.
Officer Leonard Standeford of the NOPD K9 division testified that on October 28, 2013, he and his dog Beau were summoned to the intersection'of LaSalle and Third Streets. Beau tracked the defendant’s flight path from the scene of the shooting to 2304 Third Street, “scented” the defendant underneath the front portion of the house and apprehended him.
Sergeant Marc Boudreaux, accepted by stipulation as an expert in the field of ballistics examination and analysis which he defined as the science of matching casings and fired bullets to one another and/or to a specific firearm, testified that he conducted the ballistics analysis in this case — Item J3930413 — and rendered a report which was entered as State’s Exhibit 26. Sergeant Boudreaux explained that |inhe examined two firearms related to this case — both Glock semi-automatic pistols. One firearm was a Glock Model 22, .40 caliber pistol bearing serial number N01812PD (Officer Pichon’s NOPD issued firearm), and the second was a Model 29, .10 millimeter caliber pistol with no serial number. In addition to the firearms, Bou-dreaux examined a number of .40 caliber Smith and Wesson and .10 millimeter shell casings related to this case. His testing confirmed that the .40 caliber casings were fired from the same gun — the Glock Model 22, and the .10 millimeter casings were fired by the Glock Model 29.
Detective Anthony Pardo testified that he and Detective Harold Wischan executed an order of search for a buccal swab from the defendant. The swab was obtained on November 5, 2013, while the defendant was in the custody of the Orleans Parish Criminal Sheriff’s Department. Detective Wischan placed the buccal swab into Central Evidence and Property and logged it as evidence.
Mr. John Mai of the Louisiana State Police Crime Lab, accepted by stipulation as an expert in the field of DNA serology, testified that the State Police Crime Lab received a .10 millimeter pistol (State’s Exhibit 21), a hoodie/sweatshirt (State’s Exhibit 20), a pair of shorts (State’s Exhibit 14) and two bullet cartridges from Sergeant Williams for testing. He processed the evidence for DNA by swabbing the rough and smooth surfaces of the gun, its magazine and the cartridges, as well as the inside cuffs and pockets of the hoodie and the inside waistband of the cargo shorts. After that, Mr. Mai photographed and sealed each item individually to preserve them for analysis by other lab personnel.
Ms. Tayla Pinell with the Louisiana State Police Crime Lab, accepted by stipulation as an expert in DNA analysis, testified that she performed DNA testing on the .10 millimeter Glock pistol, black hood-ie, pair of shorts and cartridges | n gathered as evidence in this case. She rendered a report of her findings, admitted as State’s Exhibit 28. She compared the DNA on the items she tested with a buccal swab taken from the defendant. Ms. Pinell stated that testing on the cartridges failed to produce a profile because of insufficient DNA; however, DNA evidence did connect *523 the defendant to the gun that fired casings at the scene. The DNA profiles developed from the other items of evidence proved to belong to the defendant. Ms. Pinell explained that the chances of the DNA profile developed in this case coming from anyone other than the defendant were one in 219 billion for the gun and one in 32.6 quintillion for the camouflage shorts.
James Huey, an employee of the communications department of the Orleans Parish Sheriffs Office whose primary responsibility is the inmate phone system testified. After explaining the administration of the inmate phone,[4] Mr. Huey identified State’s Exhibit 30 as the call detail sheet bearing number 2373024 and belonging to the defendant. The call sheet indicates that the defendant made, two phone calls from prison in November 2013. Mr. Huey also identified State’s Exhibits 31 and 32 as transcriptions of the two phone calls.[5]
| i2Bill Pursel, the defendant’s parole officer, confirmed that the defendant was convicted of second degree battery on March 5, 2012, sentenced to thirty months in the custody of the Department of Corrections, and released on parole on April 27, 2013. Officer Pursel testified he met with the defendant a month after his release and reviewed the conditions of his parole, including a warning that because of his felony conviction he was not allowed to possess a firearm during or after his parole period. In addition, Officer Pursel identified State’s Exhibit 1 — a diminution certificate of good time parole (listing the defendant’s eighteen parole conditions) signed by the defendant and acknowledging, among other restrictions: “I shall not have in my possession or control- any firearm or dangerous weapons.” In addition, Officer' Pursel identified State’s Exhibit .2 — the bill of information charging the defendant with committing second degree battery with a dangerous weapon. In- conclusion, Officer Pursel testified that the defendant had never complained to him of Officer Pichón or any other officer mistreating or harassing him. Officer Pursel indicated that the defendant’s parole was revoked because of the shooting incident in this case.
Officer, Joseph Pollard, a NOPD expert in fingerprint, analysis, testified that he fingerprinted the defendant in court prior to commencement of trial. He identified the fingerprint card as State’s Exhibit 4. Officer Pollard compared the fingerprints *524 on State’s Exhibit 4 to the prints on State’s Exhibit 3 (fingerprint card given to Pollard by the parole commission) and concluded both sets of fingerprints belonged to the defendant.
The sole witness called by the defense, Sergeant Kevin Bums, a member of the special operations division, testified that on October 29.2013, he spoke (at the request of Sergeant Williams) with the owner of a Nissan vehicle struck by a bullet | ^during the shootout.[6]' Sergeant Burns testified that on October 29, 2013, at the request of Sgt. Regina Williams, he spoke with the owner-of a Nissan vehicle which was hit by a bullet during the shootout in this case. He stated that he observed what appeared to be four K9 vehicles on the scene, but only saw one K9 officer on the scene. He relayed the information to Sergeant Williams that the K9 unit (dispatched by NOPD) Captain James Scott was on the scene. He confirmed- it was • his understanding that Sergeant Williams contacted ATF to bring an additional K9 dog to the search. In addition, the defense offered-into evidence copiés' of 3 text messages exchanged between Officer' Pichón and Ms. Dabney, as well as a photograph of Officer Pichón with a child in the kitchen of Ms. Dabney, Officer Pichon’s medical records, a personal history of Officer Pichón indicating a misdemeanor conviction, and photographs of the sweatshirt and of the scene at LaSalle and Third Street.

Errors Patent

A review for errors patent on the face of the record reveals none.

Assignment of Error 1

The defendant asserts that the trial court erred by admitting hearsay evidence and in failing to grant the defendant’s motion for mistrial pertaining to the hearsay evidence. Specifically, the defendant asserts -that the State should not have' been allowed to play the entire audio tape of the' conversation between Officer Pichón and the défendant’s mother and sister because it included ‘ inadmissible hearsay evidence and highly prejudicial remarks, including evidence of prior crimes and arrests, character evidence, and the defendant’s mother’s statement that the defendant was cápable of doing anything when he was on drugs.
| uThe defendant’s argument is-disingenuous. First, “hearsa/’ is a statement “offered in evidence to prove the truth of the matter asserted.” La. Code Evid. art 801(C). A statement is not hearsay when the declarant is testifying' at trial, subject to cross-examination, and the statement is used for impeachment purposes.' See La. Code Evid. art. 801(D)(1)(a). Thus, the excerpts of the audio tape offered by the defense in ’an effort to impeach and discredit the victim (Officer Pichón) were clearly not hearsay. Likewise, when the State played the entire audio tape to the jury to put the defense excerpts in- context, it was clearly not being offered to “prove the truth of the matter asserted” pursuant to La. Code Evid. art. 801(C). Moreover, pursuant to La. Rev. Stat. 15:450, an “admission or declaration sought to be used against any one must be used in its entirety, so.that the person to be affected thereby may have the benefit of any exculpation or explanation that the whole statement may afford.” As the Louisiana Supreme Court observed, La. Rev. Stat. 15:450 reflects “a rule of fairness observed in American jurisdictions” which, in turn, is derived from the “common-law rule of completeness” wherein if one party offers a portion -of a document,- the other party should be allowed to “put in the remainder.” State v. *525 Duke, 97-3059, p. 2 (La.10/30/98), 724 So.2d 730, 731 (1998) (citations omitted).
Similarly, “prejudicial remarks” may serve as a mandatory basis for a mistrial but only when they are offered “within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument” and then only if they referred to the defendant’s (1) race, religion, color or national origin; (2) another crime admitted by the defendant as to which evidence is inadmissible; (3) the defendant’s failure to testify; of (4) the judge’s refusal to direct a verdict. La. Code Crim. Proc. art. 770; see State v. Castleberry, 98-1388, p. 22 (La.65 4/13/99), 758 So.2d 749, 768 (mistrial is a drastic remedy and, except for instances in which the mandatory mistrial provisions of La. Code Crim. Proc. art. 770 are applicable, should only be used when substantial prejudice to the defendant is shown). In this case, the audiotape was played in its entirety for the jury only after defense counsel played excerpts of it in an attempt to impeach Officer Pichón and support the defense theory that Officer Pichón was an aggressor who conspired with his partner to cover-up his attempt to shoot the defendant with whom he had a contentious relationship because of his affair with the defendant’s sister. Although the State had not previously heard the audiotape before defense counsel played the excerpts, defense counsel was in possession of it and, thus, clearly aware of its complete content, including comments by the defendant’s mother that he was papable on anything when on drugs. In light of La. Rev. Stat. 15:450 and State v. Duke, supra, defense counsel was surely aware that playing selected portions of the audiotape would likely lead to the.jury, hearing the entire audiotape.
Finally, no prejudice to the defendant could arise from the audiotape reference to his prior conviction because not only did the conviction serve as a predicate to the charge of being a felon in illegal possession of a firearm but his conviction was disclosed to the jury in his sister’s testimony, as well as that of Officer Pollard and (probation) Officer Pureel.
This assignment of error is without merit. We do not' find that the trial court abused its discretion in allowing the entire audiotape to be played for the jury after defense counsel played selected excerpts or in denying the defendant’s motion for a mistrial.
| ^Assignment of Error 2
The defendant argues' that it was error for the trial court to deny his motion to sever. Specifically, the defendant argues that the charge of possession of a firearm by a convicted felon should have been severed from the attempted murder charge because (1) the instructions as to the separate charges confused the jury; (2) it confounded the defendant’s ability to present a theory ■ of self-defense which would have necessarily been an admission of the defendant’s possession of a firearm; (3) the combination of charges caused the jury to infer a criminal disposition on the part of the defendant; and (4) trying the charges together made the jury hostile towards the defendant and therefore more likely to find him guilty of the innocuous crime of being a felon in possession of a firearfn: "'
La. Code Crim. Proc. art. 493. provides:
Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or *526 constituting parts of a common scheme or plan; provided that the offenses •joined must be triable by the same mode of trial.
If, however, it appears that the joinder of offenses is prejudicial to the defendant, “the court may order separate trials, grant a severance of offenses, or provide whatever other relief justice requires,” La. Code Crim. Proc. art. 495.1 (emphasis added), but the motion is addressed to the sound discretion of the trial court and, absent a showing of abuse of that discretion, the court’s ruling will not be disturbed on appeal. State v. Deruise, 98-0541, p. 7 (La.4/3/01), 802 So.2d 1224, 1232 (citations omitted). “There is no prejudicial effect from joinder of two offenses when the evidence of each is relatively simple and distinct, so that the jury can easily keep the evidence of each offense separate in its deliberations.” Id. The 1 ^defendant bears a “heavy burden of proof when alleging prejudicial joinder of offenses as grounds for a motion to sever” and “[fjactual, rather than conclusory allegations are required.” State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012, 1019 (citation omitted).
The facts of each offense in this case are distinct, simple and uncomplicated. The defendant’s argument that the interruption of deliberations on several occasions for further instructions on allowable lesser charges and the distinction between certain homicides is indicative of a confused jury unable to segregate the various charges and evidence is not' supported by the record. Rather, the eleven to one jury vote for conviction on the firearm charge and ten to two for the attempted murder of Officer Pichón while failing to reach a verdict on the remaining count, demonstrates that the jury was neither confused nor unable to distinguish between the crimes charged. Moreover, as to the defendant’s assertion that his presentation of a defense was confounded by the joinder, he suggests that he “might”- have asserted self-defense had the fireai*m charge been severed but fails to describe or proffer evidence to show that his defense was compromised by the joinder of charges. Similarly, the defendant asserts that the joinder gave rise to an inference of a criminal disposition and possible jury hostility, but offers no proof of either assertion. Moreover, the jury’s inability to reach a verdict on the attempted murder of Sergeant Gillard undermines the inference of criminal disposition and jury hostility claims.
This assignment of error is without merit.

Assignment of Error 3

In this third assignment of error, the defendant claims the trial court erred by denying his mistrial request based upon prosecutorial misconduct during rebuttal | lsclosing argument. The defendant claims he was denied a fan- trial because of the prosecution’s attack upon his counsel as “a liar trying to trick the jury as opposed to an officer of this court with the right and responsibility to defend his client to the utmost of his ability.” Further, he contends the State’s closing was an attempt to impermissibly thwart his Sixth Amendment right to present a defense by suggesting that defense counsel was “a trickster attempting to pull the wool over the jury’s eyes.”
“Louisiana jurisprudence on prosecutorial misconduct allows prosecutors wide latitude in choosing closing argument tactics.” State v. Legrand, 02-1462, p. 16 (La.12/3/03), 864 So.2d 89, 101. Although La. Code Crim. Proc. art. 774 confines the scope of argument to “evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law appli *527 cable to the case,” the trial judge has broad discretion in controlling the scope of closing argument. Id. (citation omitted). Accordingly, even where the State exceeds the bounds of proper argument, a conviction -will not be reversed unless the court is thoroughly convinced that the argument influenced the jury and contributed to the verdict. Id.-, see also United States v. Rodriguez, 43 F.3d 117, 124 (5th Cir.1995) (“prosecutorial misconduct must be so pronounced and persistent that it casts serious doubt upon the correctness of the jury’s verdict.”)
In this case, the defendant references portions of the record as illustrations of alleged prosecutorial misconduct, including instances where the State attacked defense strategy and tactics, branded defense counsel a liar and not worthy of belief, and suggested that the defendant may have killed someone in the past. Specific instances include the following highlighted statements:
I TflWhile explaining why he called the defendant’s sister, April Dabney, to testify, the prosecutor stated:
Why in the world would a prosecutor call the defendant’s sister as his first witness ... I have seen this bait and hook show from the public defender’s office too many times. It is a simple trick ... They make a statement during opening[7], plant a little doubt in the Juror’s mind, never call that witness to the stand, and then argue it during close. It is the oldest trick in the book ...
[[Image here]]
Do you want to know how you can know that [April Dabney] is lying? Of all of the witnesses in this case, both State and Defense, who is the only witness the Defense didn’t ask a single question to ... I mean if there is one thing that you can say about [defense counsel] it is that he loves to ask questions ... but after I call his key witness no questions are raised because he knew she was lying ...
* * *
... Another interesting thing that came about in April’s testimony, you all remember that during the middle of that testimony when she started talking about how — when the testimony was coming out about how she was a Cl .and Officer Pichón was revealing to you all his Cl, do you all remember how you had to go out of the room, and then you came back and the courtroom was cleared? The Defense requested the courtroom be cleared after Officer Pi-chon—
Defense Counsel: For her safety and
[[Image here]]
Prosecutor: Her safety? Why would her safety be at risk if she is not really a Cl?
*528 The prosecutor also made subsequent references to “bait and switch” defense tactics:
UnRemember, [Officer Pichón] didn’t know he was being recorded[8] and it is [defense counsel’s] own words, when you don’t know you are being recorded, that is when the truth comes out. Well, if that is the case, Ladies and Gentlemen, you heard the truth on that recording when he maintained the same story he has been telling you all since this incident happened.
Nbw, I want you all to think about that full recording, what [Officer Pichón] said, that that recording is the whole truth. Think about everything you heard on there and think about the whole truth that they didn’t want you to find out about because that is the reason they played 20 seconds of a 15 — minute video, to bait and switch. They thought they would get away with that. They thought they would get away with playing 20 seconds of that 15 — minute video, but ...
Because Ms. Dabney’s testimony' was crucial to the defendant’s theory that Officer Pichón harassed the defendant, the State’s references to the lack of evidence to support Ms. Dabney’s claims of animosity and harassment by Officer Pichón towards her brother were permissible. See, e.g., State v. Martin, 539 So.2d 1235, 1240 (La.1989) (finding that State’s reference in closing argument to defense “smoke screen” tactics was not improper).
The defendant also objects to the State’s remark:
They criticize Sergeant Gillard, too. They said that [he] isn’t too good under fire, right, because he panicked, because he dropped his gun to the ground and wasn’t able to get off any shots.
Well, [defense counsel], I invite you to take off your suit ... go sit on the bench and get shot at yourself.
This comment was offered in response to defense counsel’s statement that the evidence proved Sergeant Gillard inept and unable to defend his partner’s life during an emergency situation.
Next:
I want to point you to .another question. that was asked by [defense counsel] while Sergeant Regina Williams was on the stand. Do you remember the questions about who the true owner of the gun was? She answered that it was traced to three or four people and eventually we were at Lithe end of the road, somebody traded the gun, about a year ago we lost track of it.
[Defense counsel] asked her, ‘Well, did you investigate that person for committing this crime?” That tells you the story right there, Ladies and Gentlemen. You don’t need to believe a word that is coming out of his mouth.
The trial court properly instructed the jurors prior to their deliberation that the attorneys’ arguments were not evidence. Accordingly, the State’s representation to the jury that they need not believe anything defense counsel said, while crassly phrased, does not amount to prejudicial error.
Finally:
... You can talk about how powerful the NOPD is, well, they have become powerless now. We can talk about how powerful we, we can just file charges whenever we. want, we become powerless. The only thing standing between *529 that killer and that door is the 12 of you ...
We do not condone the use of inflammatory language but, while such language may be professionally questionable, “the requirements of due process and canons of professional ethics or standards are not co-extensive.” State v. Ortiz, 11-2799, p. 6 (La.1/29/13), 110 So.3d 1029, 1034. Rather, “the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor ... the aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused.” Id., 11-2799, p. 7, 110 So.3d at 1034 (citations and internal quotation marks omitted).
In this case, the bulk of the State’s arguments were fair statements of the evidence admitted and the lack of evidence to corroborate the defense’s theory of the case. Thus, reading the State’s remarks in the context of the entire record, it does not appear that the State’s comments so influenced the jury that they contributed to the verdict. In light of the traditional breadth accorded the scope of laadosing arguments by the courts of this state, we do not find that the comments merit overturning the defendant’s conviction and sentence. See State v. Bridgewater, 2000-1529, p. 33 (La.1/15/02), 823 So.2d 877, 903 (“animal” and “cold-blooded killer” and “an animal on the hunt for prey” did not contribute to the guilty verdict).
Accordingly, we do not find that the trial court erred in denying the defendant’s motion for a mistrial. This assignment of error is without merit.

Assignment of Error 4

In his final assignment, the defendant contends his right to compulsory process was denied because an integral witness, Captain James Scott, failed to appear and testify at trial.
There is no dispute that a subpoena was issued to and served on Captain Scott. However, on the day of trial, the judge informed defense counsel during an in-chambers discussion that Captain Scott was out of town on pre-approved vacation and unable to appear for trial. The judge requested that defense counsel indicate for the record what he sought to elicit from Captain Smith. Defense counsel responded:
... Captain James Scott is mentioned in Lead Detective,Regina Williams’ police-report. He sent four NOPD K9 expeditions to the scene to search for the weapon and ... he was not lead detective, we don’t believe he had the lead detective’s permission and ... we would like to question [him] on'why he sent these four K9 units to the scene without the lead detective’s permission ...
[[Image here]]
.:. if the State is willing to- stipulate that he sent these four NOPD K9 Expeditions to the scene without Lead Detective, [Sgt.] Regina, Williams’ permission or knowledge and that.he told them to go out there and search for the weapon without her knowing, then we may be open to accepting that stipulation.
I'¡¾⅝⅛ his appellate brief,- however, the defendant argues that Captain.Scott’s testimony was integral to prove the defense theory that the evidence against the defendant (specifically, the gun and hood-ie/sweatshirt) which were not retrieved on the night of the shooting but found the following day were planted by the NOPD.
The defendant’s trial counsel requested neither a continuance[9] nor a recess and *530 elected to proceed to trial. Accordingly, this issue has not been preserved for appellate review.

Conclusion

After review of the defendant’s arguments in light of the applicable law, we affirm the judgment of the trial court.
AFFIRMED.

. The State played the audio recording of the dispatch for the jury.

. The record indicates that the trial judge heard the entire audio in chambers. The audio was not included in exhibits received with the record on appeal.

.Further in his cross examination, Pichón said he was unaware the family’s last name was Dabney.

. Mr. Huey explained that when someone is booked into Orleans Parish Prison, he is assigned a folder number, which becomes the inmate’s identity for as long as he is incarcerated. The inmate is also issued a pin number, which allows the inmate access to the prison's telephone system. That pin number follows the inmate no matter where he is housed in the prison. All calls made by inmates are audio recorded, and a call detail sheet, which lists the time, date, location and length of the call, as well as the folder number and’ the name of person who made the call, is generated.

. The State played the recorded- calls for the jury. In one of the calls, the defendant is heard speaking to "Peter” and tells him: "... to ask Night ... where we used to get it in at ...” The defendant then tells Peter: "... if you go right there you, might, um, Danielle, ya heard me ... Danielle, should be right, Danielle should be ‘round there.’ " (State’s Exhibit 31, ,p. 3, transcript of! jail call of 11/9/13). In the. second call, Peter says; "Man I can’t find out where she stay at.” The defendant replies: "Oh no? Like you went all and knocked on the side and shit?” The defendant continues: "You know you probably can’t see the bitch probably can’t see you, you know what I’m sayin’ cause they got all that grass and shit you know what I’m saying. Like vines and shit.” (State’s Exhibit 32, pp. 3-4, transcript of jail call of 11/11/13).
The State theorized that the defendant was instructing "Peter” in code where and how to locate the weapon the defendant used and hid the night of the shooting.

. The Nissan was subsequently removed to the NOPD evidence cage.

. During its opening statement, the defense said that the jury would hear of an alleged illicit relationship between April Dabney and Officer Pichón, alluding to testimony that would come from a defense witness:
... [t]he third way that you are going to know that [the defendant] is innocent is when you hear about the personal bias, the personal vendetta that [Officer Pichón] had' against [the defendant] because you are going to hear testimony during this trial about the relationship that a married 32-year-old [Officer Pichón] had with [the defendant’s] 19 year old sister [April Dabney]. You are going to hear that Michael Dabney did not like that relationship, that it caused tension between him and [Officer Pichón] ... You are going to hear that even after the shooting [Officer Pichón] continued trying to date [the defendant’s] younger sister [April],
(Tr. trans. Vol.2, p. 93).

. The record indicates that April Dabney recorded on her cell phone a conversation Officer Pichón had with the defendant’s mother at the Dabney home after this incident.

. According to La. Code Crim. Proc. art. 709(A), a motion for a continuance based *530 upon the absence of a witness must state all of the following:
(1)Facts to which the absent witness is expected to testify, showing the materiality of the testimony and the necessity for the presence of the witness at the trial.
(2) Facts and circumstances showing a probability that the witness will be available at the time to which the trial is deferred.
(3) Facts showing due diligence used in an effort to procure attendance of the witness.