STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2018 KA 1764

STATE OF LOUISIANA

VERSUS

NATHAN CURRY

Judgment Rendered: **SEP 2 7 2019**

* * * * * * *

APPEALED FROM THE TWENTY-THIRD JUDICIAL DISTRICT COURT
IN AND FOR THE PARISH OF ASCENSION
STATE OF LOUISIANA
DOCKET NUMBER 29,597

HONORABLE ALVIN TURNER, JR. JUDGE

* * * * * * *

Ricky Babin
District Attorney
Donaldsonville, Louisiana

Attorneys for Appellee
State of Louisiana

Donald D. Candell
Lindsey Manda
Assistant District Attorneys
Gonzales, Louisiana

Jane L. Beebe
New Orleans, Louisiana

Attorney for Defendant/Appellant
Nathan Curry

BEFORE:  McDONALD, THERIOT, and CHUTZ, JJ.

**McDonald, J.**

The defendant, Nathan Curry, was charged by grand jury indictment with second degree murder, a violation of La. R.S. 14:30.1. He pled not guilty. After a trial by jury, he was found guilty as charged. The trial court denied a motion for post-verdict judgment of acquittal and two motions for new trial filed by the defendant. The trial court sentenced the defendant to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence. The defendant now appeals, assigning error based on the sufficiency of the evidence, prosecutorial statements during closing arguments, and the non-unanimous jury verdict. For the following reasons, we affirm the conviction and sentence.

## STATEMENT OF FACTS

On the night of March 10, 2012, a group of individuals, mostly from Donaldsonville, Louisiana, travelled in at least four separate vehicles to Geismar and Gonzales, Louisiana, to attend social gatherings. In Geismar, they went to the Geismar Community Center, but left abruptly, when a fight broke out and police arrived. Upon leaving, some in the group headed back to Donaldsonville while others travelled to a Gonzales neighborhood where one member of the group, Davonne Solomon (the victim herein), was shot in the chest.

According to Sparkle Bell, Ariel Dunn, Jardell Pleasant, and Robert Gibson (the driver), four Donaldsonville individuals who rode together to Gonzales with the victim, when they turned off Darla Avenue to Amber Street (a dead end street), they saw a group of people standing outside. As they exited their vehicle, shots were fired. At that time, Ariel, who did not see who was shooting, was shot in the arm and in the side. Robert witnessed someone yell, "Back up, back up, back up ... police, police," and saw Davonne stepping back just as "the dude" fired gunshots. Robert did not know the person who shot Davonne, nor did he get a

2

good look at him, but he noticed that the shooter was wearing a camouflage jacket and had dreadlocks. Jardell similarly stated that he saw a person with a gun in his hand say, "Y'all back the f—k up." Jardell backed up and turned around, and the shots were fired as he ran. Jardell noted that the person with the gun was wearing a "camouflage jacket with the dreads in his head." Jardell did not see Davonne get shot, as he was not looking toward Davonne at the time of the gunfire.[1]

Sparkle, however, maintained that she saw Davonne being shot. According to Sparkle, after they exited their vehicle, the defendant, who she knew before that night, approached Davonne, pointed a gun at his chest, and shot him. Sparkle was approximately five feet from the defendant at the time. Sparkle noted that the defendant had dreadlocks at the time of the shooting. Sparkle identified the defendant as Davonne's shooter in a photographic lineup, and again in court at trial.

## ASSIGNMENT OF ERROR NUMBER ONE

In assignment of error number one, the defendant argues that the State failed to meet its burden of proving all of the elements of the crime beyond a reasonable doubt. Thus, the defendant argues that the trial court erred in denying his motion for post-verdict judgment of acquittal and his motion for new trial on that basis. Noting that the only question in this case was the identity of the shooter, the defendant contends that there was no physical evidence to connect him to the shooting. The defendant concedes that, before the trial, two witnesses identified him as the shooter. However, he contends that, at trial, one of the witnesses, Max Batiste, testified that he did not see the defendant shoot anyone. Regarding the other witness, Sparkle, the defendant contends that she was inconsistent as to

---

1 According to Jardell, after the gunfire, Davonne ran to the vehicle that Jardell arrived in stating, "I'm shot. Let me get in the car." Jardell and the driver, Martell Oliver, took Davonne to the hospital. Dr. Christopher Tape, who performed the autopsy, testified that the victim's cause of death was a gunshot wound to the left chest from a bullet that went through the victim's ribs, lungs, and heart, before exiting his left back.

3

whether she was outside or in the civic center restroom when the fight began between the Gonzales and Donaldsonville males. The defendant further contends that, at trial, Sparkle had to be confronted with her pretrial police statement before admitting that she believed two shooters were involved. He claims that Sparkle's account of the shooting contradicted the State's theory that there was only one shooter with one gun. Further, the defendant notes the lack of physical evidence or a ballistic expert to support the State's theory. The defendant argues that the trial court, in denying the post-trial motions, failed to see the flaws in the evidence to prove identity.

The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. **Jackson v. Virginia**, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979). See also La. C.Cr.P. art. 821(B); **State v. Ordodi**, 2006-0207 (La. 11/29/06), 946 So.2d 654, 660. The **Jackson** standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. **State v. Patorno**, 2001-2585 (La. App. 1st Cir. 6/21/02), 822 So.2d 141, 144.

When analyzing circumstantial evidence, La. R.S. 15:438 provides that the factfinder, in order to convict, must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. When a case involves circumstantial evidence and the trier of fact reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. **State v. Dyson**, 2016-1571 (La. App. 1st Cir. 6/2/17), 222 So.3d 220, 228, writ denied, 2017-1399 (La. 6/15/18), 257 So.3d 685.

4

Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1). Specific criminal intent is that state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Though intent is a question of fact, it need not be proven as a fact. It may be inferred from the circumstances of the transaction. Thus, specific intent may be proven by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances. Specific intent is an ultimate legal conclusion to be resolved by the factfinder. **State v. Coleman**, 2017-1045 (La. App. 1st Cir. 4/13/18), 249 So.3d 872, 877, writ denied, 2018-0830 (La. 2/18/19), 263 So.3d 1155. Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person. See **State v. Maten**, 2004-1718 (La. App. 1st Cir. 3/24/05), 899 So.2d 711, 717, writ denied, 2005-1570 (La. 1/27/06), 922 So.2d 544; **State v. Henderson**, 99-1945 (La. App. 1st Cir. 6/23/00), 762 So.2d 747, 751, writ denied, 2000-2223 (La. 6/15/01), 793 So.2d 1235.

The State bears the burden of proving the elements of the charged offense, as well as the identity of the defendant as the perpetrator. See **State v. Draughn**, 2005-1825 (La. 1/17/07), 950 So.2d 583, 593, cert. denied, 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007). When the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification. A positive identification by only one witness is sufficient to support a conviction. **State v. Weary**, 2003-3067 (La. 4/24/06), 931 So.2d 297, 311, cert. denied, 549 U.S. 1062, 127 S.Ct. 682, 166 L.Ed.2d 531 (2006).

5

Sergeant Stephen Nethken of the Gonzales Police Department (GPD) responded to St. Elizabeth Hospital, where Davonne and Ariel were transported. He learned that he would not be able to speak with Davonne (as he was suffering from a fatal gunshot wound and attempts to sustain his life were taking place) and that Ariel was in no position to identify the shooter (as she was running and ducking once the gunfire started). However, Sergeant Nethken interviewed Sparkle, who was at the hospital with Ariel at the time. Sergeant Nethken also interviewed Robert, who was also at the hospital. Robert showed Sergeant Nethken a hole in the right rear quarter panel of his vehicle from a bullet that entered his vehicle at the time of the shooting. Sergeant Nethken recovered the projectile from the trunk of the vehicle. Both Sparkle and Robert described the shooter as a dark-skinned black male with dreads wearing a camouflage jacket, though Robert stated that he could not identify the shooter.

While at the hospital, Sergeant Nethken also interviewed Brandy Hill, who stated that she witnessed the shooting, and she identified the shooter as Nathan Curry. Her physical description of the shooter was consistent with that of Sparkle and Robert. Sergeant Nethken then briefly left the hospital to create a six-person photographic lineup that included a picture of the defendant. When he returned to the hospital, he discovered that Brandy had left. Sergeant Nethken then showed the lineup to Sparkle, who immediately identified the defendant as the person who shot Davonne.

Sergeant Nethken then proceeded to the crime scene, which consisted of a significant portion of Amber Street that was already being investigated by other officers at the time. A projectile, which entered through a window, was recovered from a residence located south of the crime scene, and another projectile was found lying on Amber Street. Ten shell casings of the same caliber and brand were also

collected on Amber Street and from the yard of a nearby residence located closer to the Darla Avenue side of Amber Street. All of the shell casings and projectiles, including the one recovered from Robert's vehicle, along with additional evidence, were packaged and sent to the crime lab for testing.[2]

After processing the evidence, Sergeant Nethken located Brandy, who recanted her statement, stating that she was not actually at the crime scene, but had heard from others in the hospital parking lot that the defendant was the shooter. After Davonne's autopsy, Sergeant Nethken located another witness, Max Batiste, who stated that he saw Davonne's shooting, that the defendant was the shooter, and that the defendant was wearing a camouflage jacket and had medium length dreads at the time. Sergeant Nethken further testified that Max identified the defendant from a photographic lineup. However, at trial, when Max was asked if he saw the defendant shoot anyone he responded, "No, sir." When asked if he gave a statement to Sergeant Nethken, he stated, "I plead the fifth, man." He did not offer any further testimony.

Several trial witnesses, including Sparkle, Ariel, Robert, and Jardell, testified that they were with Davonne at the time of the shooting. They all testified that to their knowledge, Davonne (whom some also referred to as "Bateau") was not armed with any sort of weapon at the time of the shooting. While there was some discrepancy among the trial witnesses as to whether the group of individuals who were standing outside were blocking their vehicles, each of the witnesses maintained that they did not go to the neighborhood or exit their vehicles with the intention of fighting or starting a conflict.

---

[2] Although a weapon was not recovered, the crime lab determined that all of the tested projectiles and casings were fired from the same weapon.

Sparkle recalled telling the police that the people from Gonzales opened fire. When asked how many shots the defendant fired, Sparkle testified, "I seen one." She initially testified that she did not recall telling the police that she believed there was a second shooter. But, when the question was rephrased, she confirmed that she told the police that a second shooter was in the area based on her observation of sparks from gunfire. She reiterated that the defendant was the person who she saw shoot Davonne.

The defendant's sister, Veshon Curry, testified at trial. Veshon indicated that she initially went to the Geismar Community Center that night, but by the time she and others arrived, the party had already been shut down. They subsequently went to Jaylen Bell's residence on Amber Street. She testified that, when they arrived, at least fifteen car loads of people pulled into the subdivision playing loud music and screaming as they exited their vehicles. She stated that she saw Max, with "[t]he booty of his gun hanging out his pants" and that "Bateau" (Davonne) looked like he was reaching for a gun as he walked towards her. Suddenly, she heard gunshots. At that point, she fled. She confirmed that Max and Sparkle were also at the scene of the shooting. Veshon admitted that she neither called nor gave a statement to the police about what she witnessed.

Defense witness Christopher Heard testified that he was at the party at the Geismar Community Center that night with a group of friends. He said that people from Donaldsonville were being turned around at the front door and not allowed in due to a "beef" between the Donaldsonville and Gonzales residents. He further testified that, at some point, he saw the people from Donaldsonville entering a side door, that tension starting building, and that people started pushing each other. He stated that, at some point, he was hit with a bottle, adding, "that's when licks started going, the fight broke out." After the police were called, Christopher and

8

his friends went to Worthy Street (near the scene of the shooting), where they were accosted by two individuals before running to Amber Street. While on Amber Street, Christopher saw the defendant, who was at Joey Bell's house. As he was talking to the defendant, the group of cars with occupants from Donaldsonville arrived in the area. He noted that they were outnumbered as it was only nine or ten of them, but more occupants of the vehicles than he was able to count. He stated that the individuals were playing loud music, and after exiting their vehicles, were making threatening remarks. He observed two of the males lifting their shirt, a gesture that he believed was an indication that they were armed with guns. He testified, "I could tell that they had a gun." At that point, he feared for his life and fled on foot.

When asked if he actually saw a gun, Christopher said, "No. But from what it looked like, from what I could see, at nighttime, that's what I thought." When specifically asked if he saw Davonne with a gun, he testified, "I couldn't tell you who Davonne Solomon is if you even put a picture in front of me." He further stated that he would not be able to pick out anyone who was involved in the fight inside of the Geismar Community Center and did not know whether they were the same individuals who went to Amber Street.

At the outset, we note that a trial court's determination regarding the weight of the evidence under La. C.Cr.P. art. 851(B)(1) is not reviewable on appeal, except for error of law. **Dyson**, 222 So.3d at 234; see also La. C.Cr.P. art. 858. Article 851(B)(5) allows the trial court to grant a new trial if the ends of justice would be served, although the defendant may not be entitled to a new trial as a matter of strict legal right. The grant or denial of a new trial pursuant to Article 851(5) does not involve questions of fact. In deciding whether the trial court abused its discretion in granting or denying a new trial under Article 851(B)(5), we

9

keep in mind two precepts. One, the trial court is vested with almost unlimited discretion, and its decision should not be disturbed unless there has been a palpable abuse of that discretion. Two, this ground for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case, the motion should be denied, no matter upon what allegations it is grounded. **State v. Guillory**, 2010-1231 (La. 10/8/10), 45 So.3d 612, 615 (per curiam). Herein, the defendant has made no showing that an error of law, injustice, or abuse of discretion was committed. Accordingly, we find no error in the trial court's denial of the motion for new trial on this basis.

Further, the trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. **Coleman**, 249 So.3d at 878. After a careful review of the record, we cannot say that the jury's determination was irrational under the facts and circumstances presented to them. See **Ordodi**, 946 So.2d at 662. Sparkle repeatedly positively identified the defendant as Davonne's shooter and did not waver in that regard.[3] Further, others at the scene described the shooter as having dreads and wearing a camouflage jacket. Specifically, although they were unable to make a positive identification, Robert's and Jardell's description of the shooter's hair and attire was consistent with Sparkle's description. While testimony from Veshon and Christopher was presented in an attempt to show that Davonne was armed with a gun, their testimony does not establish that either of them actually

---

[3] As the defendant notes on appeal, Sparkle testified at trial that she had gone into the restroom at the Geismar Community Center, but admitted that before trial, she told the police that she did not go inside of the Geismar Community Center. The jury heard this minor discrepancy. Regardless of any inconsistencies in Sparkle's testimony, the verdict indicates that the jury chose to believe her testimony as to her visual identification of the defendant as Davonne's shooter. This court cannot second guess that credibility determination. See **State v. Alexander**, 2017-1166 (La. App. 3d Cir. 9/26/18), 256 So.3d 365, 376, writ denied, 2018-1794 (La. 4/15/19), 267 So.3d 1130 (wherein the court held that it could not second guess the credibility determination made by the jury in choosing to believe a witness's testimony, despite inconsistencies and even an admission that some of the witness's testimony was untruthful).

saw Davonne with a weapon. Christopher testified that he did not know Davonne, was not familiar with Davonne at the time of the shooting, and was not certain if Davonne was one of the individuals who he saw at the scene. Further, Veshon and Christopher testified that they fled before or at the point of the gunfire and did not see who was firing the gunshots. Finally, neither Veshon nor Christopher offered any testimony that conflicted with Sparkle's identification of the defendant as Davonne's shooter.

An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the factfinder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the trier of fact. See **State v. Mire**, 2014-2295 (La. 1/27/16), 269 So.3d 698, 703 (per curiam); **State v. Calloway**, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam). Viewing the evidence in the light most favorable to the prosecution, we are convinced that a rational trier of fact could find that the State proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of second degree murder and the defendant's identity as the perpetrator. Thus, the trial court did not err in denying the defendant's motion for post-verdict judgment of acquittal. Assignment of error number one lacks merit.

## ASSIGNMENT OF ERROR NUMBER TWO

In assignment of error number two, the defendant argues that the prosecutor made an inappropriate, unprofessional statement about the defense attorney during rebuttal closing arguments. Specifically, he contends that when the prosecutor referred to the defense attorney as a magician, he was in essence calling the defense attorney a liar. The defendant notes that the defense attorney, "in a professional manner," waited for the prosecutor to complete the rebuttal closing

11

argument before requesting a bench conference and requesting an admonishment. Noting that the trial court only agreed to give the standard instruction that arguments do not consist of evidence as opposed to a specific admonishment, the defendant argues that there was no actual repercussion for the prosecutor's "personal insult" and improper comment. The defendant further notes that his first motion for new trial was partly based on the prosecutor's comment. He argues that once the jury heard the inflammatory and prejudicial comment, the nearly unavoidable inference that the defense attorney was being deceptive made a fair trial and fair assessment of the evidence unlikely. The defendant argues that the error was not harmless, claiming that it played on the "bad reputation" of criminal defense attorneys, that the evidence was "tenuous at best[,]" and that the ten of twelve verdict was "barely secured[,]" as one of the jurors wavered.

Closing arguments in criminal cases should be restricted to the evidence admitted, to the lack of evidence, to conclusions of fact that may be drawn therefrom, and to the law applicable to the case. Further, the State's rebuttal shall be confined to answering the argument of the defendant. See La. C.Cr.P. art. 774. The trial court has broad discretion in controlling the scope of closing argument. **State v. Mitchell**, 2016-0834 (La. App. 1st Cir. 9/21/17), 231 So.3d 710, 719, writ denied, 2017-1890 (La. 8/31/18), 251 So.3d 410. Upon request of defendant, the court may, in its discretion, grant a mistrial or an admonishment, premised upon argument by the State which is irrelevant or immaterial and of such a nature that it might create prejudice against defendant in the mind of the jury. La. C.Cr.P. arts. 770 and 771.

Prosecutors are allowed wide latitude in choosing closing argument tactics. See **Draughn**, 950 So.2d at 614; **State v. Patton**, 2010-1841 (La. App. 1st Cir. 6/10/11), 68 So.3d 1209, 1221. The State should avoid personal attacks on defense

12

counsel and trial strategy. **State v. Jones**, 2015-0123 (La. App. 4th Cir. 12/2/15), 182 So.3d 251, 279, <u>writ denied</u>, 2016-0027 (La. 12/5/16), 210 So.3d 810. However, such statements generally do not rise to the level that merits reversal of a conviction. <u>See</u> **State v. Dabney**, 2015-0001 (La. App. 4th Cir. 9/9/15), 176 So.3d 515, 527, 529, <u>writ denied</u>, 2015-1852 (La. 10/17/16), 208 So.3d 374 (holding that "instances where the State attacked defense strategy and tactics, branded defense counsel a liar and not worthy of belief, and suggested that the defendant may have killed someone in the past" did not require reversal "[in] light of the traditional breadth accorded the scope of closing argument by the courts of this state[.]") Even if the prosecutor exceeds the bounds of proper argument, a reviewing court will not reverse a conviction if not "thoroughly convinced" that the argument influenced the jury and contributed to the verdict. <u>See</u> **State v. Prestridge**, 399 So.2d 564, 579 (La. 1981); **Mitchell**, 231 So.3d at 719.

In the instant case, the defendant references the following portion of the State's rebuttal in closing argument referring to the defense attorney, Mr. John:

> And Mr. John brings up a piece of evidence, a shirt in the yard. We didn't introduce it as evidence because why? It had no evidentiary value. Smoke and mirrors. Throw some stuff out there, get you looking here when you're doing something over there.

> And that's what this is about. You know, I knew Mr. John was a pilot. I didn't realize he was a magician. You know what a magician uses as his trick? He sits over here and shows you all of this in this hand, get you flashing, when it's in this hand. And that's what he's doing.

At the conclusion of the rebuttal, the defense attorney requested a bench conference and asked the trial court to admonish the jury regarding the above remarks. In response, the trial court stated that it would inform the jury that closing arguments are not evidence.

As the defendant notes on appeal, he reasserted the issue in his first motion for new trial. Under La. C.Cr.P. art. 851(B), in pertinent part, the court, on motion

13

of the defendant, shall grant a new trial whenever the court's ruling on an objection made during the proceedings shows prejudicial error, or when the court is of the opinion that the ends of justice would be served by the granting of a new trial. The ruling on a motion for new trial is committed to the sound discretion of the trial court and will be disturbed on appeal only when there is a clear showing of an abuse of that discretion. **State v. Duvall**, 97-2173 (La. App. 1st Cir. 12/28/99), 747 So.2d 793, 797, writ denied, 2000-1362 (La. 2/16/01), 785 So.2d 838, cert. denied, 543 U.S. 1160, 125 S.Ct. 1319, 161 L.Ed.2d 130 (2005).

We note that, during jury instructions, the trial court informed the jury that statements of counsel are not evidence. As the defendant concedes, in accordance with its ruling on the request for an admonishment, the trial court also informed the jury that opening and closing arguments are not to be considered as evidence. We further note that credit must be given to the "good sense and fair-mindedness of the jurors who heard the evidence" at trial. **State v. Mills**, 2013-0573 (La. App. 1st Cir. 8/27/14), 153 So.3d 481, 496, writs denied, 2014-2027 (La. 5/22/15), 170 So.3d 982 and 2014-2269 (La. 9/18/15), 178 So.3d 139. The comments at issue herein were in response to the defense counsel's argument in closing that the evidence, despite eyewitness testimony identifying the defendant as the shooter and the consistent descriptions of the shooter, did not show that the defendant was at the scene or committed the shooting. Therefore, the State's responsive remarks are arguably within the scope of La. C.Cr.P. art. 774. Moreover, we are not "thoroughly convinced" the comments, even if improper, contributed to or influenced the verdict considering the entirety of the record. Therefore, we find no abuse of discretion in the trial court's decision to not specifically admonish the jury, nor do we find any reason to disturb the trial court's denial of the motion for new trial on this basis. Accordingly, assignment of error number two lacks merit.

## ASSIGNMENT OF ERROR NUMBER THREE

In assignment of error number three, the defendant argues that, because his conviction is not yet final, his conviction is subject to the retroactive application of the amended version of La. C.Cr.P. art. 782(A). The defendant acknowledges that the amendment provides that the change in the law is prospective, but argues that under **State v. Draughter**, 2013-0914 (La. 12/10/13), 130 So.3d 855, 860, and **Griffith v. Kentucky**, 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987), the amendment should be applied retroactively. Considering the ten of twelve concurrence in the jury verdict in this case, the defendant argues that a retroactive application of the law requires a reversal of his conviction.

It is well settled that a constitutional challenge may not be considered by an appellate court unless it was properly pleaded and raised in the trial court below. A party must raise the unconstitutionality in the trial court, the unconstitutionality must be specially pleaded, and the grounds outlining the basis of unconstitutionality must be particularized. See **State v. Hatton**, 2007-2377 (La. 7/1/08), 985 So.2d 709, 718-19. As noted by the State, based on the record in the instant case, the defendant failed to raise his challenge to La. Const. art. I, § 17(A) and La. C.Cr.P. art. 782(A) in the trial court. Thus, this issue is not properly before this court. See **State v. Talley**, 2018-1300 (La. App. 1st Cir. 5/9/19), ___ So.3d ___, ___, 2019 WL 2051339, *7.

Moreover, even if we were to address the issue, it is meritless. As provided by La. Const. art. I, § 17(A) (as amended by 2018 La. Acts No. 722, § 1) and La. C.Cr.P. art. 782(A) (as amended by 2018 La. Acts No. 493, § 1), a case for an offense committed prior to January 1, 2019, in which punishment is necessarily confinement at hard labor, shall be tried by a jury composed of twelve jurors, ten

of whom must concur to render a verdict.[4] Under both state and federal jurisprudence, it has been held that a criminal conviction by a less than unanimous jury does not violate a defendant's right to trial by jury as specified by the Sixth Amendment and made applicable to the states by the Fourteenth Amendment. See **Apodaca v. Oregon**, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972); **State v. Belgard**, 410 So.2d 720, 726 (La. 1982); **State v. Brooks**, 2017-1755 (La. App. 1st Cir. 9/24/18), 258 So.3d 944, 953, writ denied, 2018-1718 (La. 2/25/29), 266 So.3d 289.

Our supreme court in **State v. Bertrand**, 2008-2215 (La. 3/17/09), 6 So.3d 738, 742-43, found that a non-unanimous, twelve-person jury verdict is constitutional and that Article 782 does not violate the Fifth, Sixth, or Fourteenth Amendments. Regarding the equal protection argument that such verdicts have an insidious racial component, the **Bertrand** court noted that the issue had already been decided as meritless by a majority of the United States Supreme Court in **Apodaca**. **Bertrand**, 6 So.3d at 743. The 2018 statutory amendments at issue here do not undermine those holdings.

We note that the United States Supreme Court, and other courts, have cited or discussed the **Apodaca** opinion various times since its issuance and, it is apparent that its holding as to non-unanimous jury verdicts represents well-settled law. **Bertrand**, 6 So.3d at 742. In **McDonald v. City of Chicago**, 561 U.S. 742, 764-65, 130 S.Ct. 3020, 3034-35, 177 L.Ed.2d 894 (2010), the Supreme Court recognized that most, but not all, of the protections of the Bill of Rights are enforceable against the states through the Fourteenth Amendment. However,

---

[4] For cases in which the punishment is necessarily confinement at hard labor, the constitutional and statutory provisions at issue were amended to require unanimous jury verdicts, if the offense was committed on or after January 1, 2019. However, for an offense committed before January 1, 2019, in which the punishment is necessarily confinement at hard labor, as in the instant case, ten of twelve jurors must concur to render a valid verdict.

citing **Apodaca** in support of the proposition, the Supreme Court specifically stated in **McDonald** that, although the Sixth Amendment requires unanimous jury verdicts in federal criminal trials, it does not require unanimous jury verdicts in state criminal trials. **McDonald**, 561 U.S. at 766 n.14, 130 S.Ct. at 3035 n.14. Therefore, in **McDonald** the Supreme Court reaffirmed the holding of **Apodaca**.[5]

Considering the foregoing, La. Const. art. I, § 17(A) and La. C.Cr.P. art. 782(A), insofar as the provisions continue to permit non-unanimous jury verdicts, are not unconstitutional and, therefore, not in violation of the defendant's constitutional rights. See **State v. Hammond**, 2012-1559 (La. App. 1st Cir. 3/25/13), 115 So.3d 513, 514-15, writ denied, 2013-0887 (La. 11/8/13), 125 So.3d 442, cert. denied, 572 U.S. 1090, 134 S.Ct. 1939, 188 L.Ed.2d 965 (2014). We further note that Louisiana follows the general rule that a constitutional provision or amendment has prospective effect only, unless a contrary intention is clearly expressed. **State v. Cousan**, 1994-2503 (La. 11/25/96), 684 So.2d 382, 392-393. But we need not defer to the general rule, because La. Const. art. I, § 17(A) and La. C.Cr.P. art. 782(A), as amended in 2018 to require unanimous jury verdicts, explicitly provide that the amendment is applicable to offenses that occur on or after January 1, 2019. In accordance with the above, there can be no retroactive application of these amendments, and the defendant's conviction by a non-unanimous jury verdict is not unconstitutional. Thus, assignment of error number three lacks merit.

---

[5] We recognize that **State v. Ramos**, 2016-1199 (La. App. 4th Cir. 11/2/17), 231 So.3d 44, writ denied, 2017-2133 (La. 6/15/18), 257 So.3d 679, and writ denied sub nom., **State ex rel. Evangelisto Ramos v. State**, 2017-1177 (La. 10/15/18), 253 So.3d 1300, and cert. granted sub. nom, **Ramos v. Louisiana**, 139 S.Ct. 1318, 203 L.Ed.3d 563 (2019), is currently before the United States Supreme Court, which may address the issue of whether the unanimous jury verdict requirement of the Sixth Amendment to the United States Constitution applies to the states through application of the Fourteenth Amendment. However, as stated by the Louisiana Supreme Court in **Bertrand**, under current jurisprudence from the U.S. Supreme Court, non-unanimous twelve-person jury verdicts are constitutional. As an intermediate court, we are bound by that precedent. **State v. Acevedo**, 2018-683 (La. App. 5th Cir. 5/8/19), 273 So.3d 462, 487.

## DECREE

Therefore, for the foregoing reasons, the conviction and sentence are affirmed.

**CONVICTION AND SENTENCE AFFIRMED.**